## IN THE DISTRICT COURT OF THE UNITED STATES

## FOR THE DISTRICT OF NEW MEXICO

DAVID J. LOPEZ,

        Plaintiff,

v.                                          No. CIV 11-921 BB/LFG

OFFICER ROBERT STOCKTON,
and OFFICER SAENZ,

        Defendants.

### MAGISTRATE JUDGE'S ANALYSIS
### AND RECOMMENDED DISPOSITION[1]

      This is a *pro se, in forma pauperis* civil rights action brought under 42 U.S.C. § 1983.

Plaintiff David J. Lopez ("Lopez") is incarcerated at the State Penitentiary in Santa Fe, New Mexico.

      Lopez's civil rights complaint, filed October 13, 2011 [Doc. 1] alleges that Defendant

Albuquerque Police Officers Robert Stockton and Saenz ("Defendants," "Defendant Saenz," or

"Defendant Stockton") detained and searched Lopez without reasonable suspicion or probable cause.

Thus, Lopez asserts that his Fourth Amendment rights were violated.[2]  Lopez asks that Defendants

---

[1]Within fourteen (14) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the fourteen-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.  *See, e.g.*, Wirsching v. Colorado, 360 F.3d 1191, 1197 (10th Cir. 2004) ("firm waiver" rule followed in Tenth Circuit holds that a party who fails to object to magistrate judge's findings and recommendations in timely manner waives appellate review of both factual and legal questions).

[2]In an Order, filed November 22, 2011, the Court dismissed any and all claims asserted against Chief of Police Ray Schultz. [Doc. 6.] Thus, the Fourth Amendment claim proceeded against remaining Defendants Stockton and Saenz.

be fired, arrested, and prosecuted, and further, that he be awarded $500,000 in compensatory damages and $500,000, or possibly, 5 million dollars in punitive damages. [Doc. 1, at 5.]

## Procedural Background

On February 7, 2012, Defendants filed their Answer, denying the allegations of Fourth Amendment violations. [Doc. 13.] On February 9, 2012, the Court directed Defendants to produce a Martinez report, and informed Lopez that he could file a response. [Doc. 14.] On February 15, 2012, Lopez filed a reply to the Answer. [Doc. 17.]

Defendants sought and received an extension to file their Martinez report. [Doc. 25, 28.] On April 20, 2012, Defendants filed a Martinez report, with exhibits and affidavits, and asked that the Court construe the Martinez report as a request for summary judgment. [Doc. 30.] Lopez filed several responses to the Martinez report (one before the report was produced and one subsequent to the report). The Court considered both pleadings, with attachments. [Doc. 19, 31.] On May 10, 2012, Defendants filed a reply in support of their Martinez report and request for summary judgment. [Doc. 33.]

## Factual Background

Lopez alleges that on September 30, 2010, Defendants illegally detained and searched him while investigating a domestic call that had nothing to do with him. [Doc. 1, at 2.] The search of Lopez's person led to his arrest for an outstanding felony warrant, along with a new charge against him for concealing his identity.

The incident in question occurred at Jeremy Aragon's ("Aragon") residence, 512 Ortiz SE, Apartment 8, in Albuquerque, New Mexico. Lopez stated he was visiting his friend, Aragon, at his apartment on September 30th. [Doc. 1, at 3.] Lopez alleged that when Defendant officers arrived in response to a domestic relations call, Lopez "got up to leave" Aragon's residence, but that

Defendant Saenz ordered him to have a seat.  Lopez claimed that he tried to explain to Defendants that whatever they were attending to did not concern him.  However, Defendants turned their attention to Lopez, after deciding there was no urgency concerning the domestic matter.  Lopez again tried to tell Defendants that he "had to go home now and that I wanted to leave."  According to Lopez, Defendants handcuffed him, frisked him, and removed his wallet. [Id., at 4.]

Lopez omitted numerous facts relating to the incident in question.  The Court sets forth the following information based on the Martinez report, the attached police reports, transcribed belt tape recordings, and Defendants' affidavit statements, in addition to Lopez's allegations.  Aragon and his roommate, Candice Baca, resided at 512 Ortiz Street SE, Apt. No. 8.  Ms. Baca had a two-year old child at the time.  Ms. Baca's brother Johnny Baca, and his girlfriend, Joan Scott, lived in an apartment next to Aragon and Ms. Baca.

Police officers originally were dispatched to 512 Ortiz St. in relation to a domestic dispute between Ms. Baca and her brother Johnny, concerning Ms. Baca's child.  Johnny Baca allegedly had Ms. Baca's son in his apartment and refused to return the child to his sister.  [Doc. 30, Exs. A, D, F.] That matter initially appeared to have been resolved with police intervention.

However, subsequently (either later that day or the next day), Ms. Baca called the police again, this time from work.  While at work, Ms. Baca received a call from a neighbor at her apartment complex stating that Johnny Baca and his girlfriend were knocking at or "banging" on Ms. Baca's apartment door.  At that time, Ms. Baca reported that Aragon and Ms. Baca's son were inside Aragon's and Ms. Baca's apartment.  Ms. Baca wanted the police dispatched to her apartment again, even though she was not present, to ensure that Johnny did not enter her apartment. [Doc. 30, at 4, Ex. D.]

3

On September 30, 2010, Defendant officers were dispatched to 512 Ortiz St. in response to Ms. Baca's call from work.  Aragon allowed Defendants to enter the apartment. [Doc. 30, Ex. B, at 2; Ex. C.]  Present in the apartment were Aragon, Ms. Baca's child, 21-year old Alejandra Avila, and Plaintiff David Lopez, who, initially when asked, told police his name was Carlos Mendoza. [Doc. 30, at 5, Exs. B, C, I, J.] When Defendants entered the apartment, Ms. Avila was seated in a chair and Lopez was inside or near the kitchen. [Doc. 30, Ex. B.]

Aragon described problems with a neighbor, Johnny Baca, who had continuously knocked at his front resident door about 40 minutes before the police arrived.  Defendants asked the three adults in the apartment for their identification, and all three stated they had no identification cards, but willingly identified themselves. [Doc. 30, Exs. B, C, I.]

Lopez identified himself as Carlos Mendoza, born on January 3, 1985, which made him 25 years old.  Based on experience, Defendants believed that Mendoza/Lopez appeared significantly older than 25; in fact, Lopez was more than 20 years older and was actually 48 years old. [Doc. 30, Ex. I.]

Defendants also observed that Lopez continuously looked at Ms. Avila and was whispering to her.  According to Defendants, Lopez appeared nervous, his hands were shaking, and he was fidgeting with his arms and hands. [Doc. 30, Ex. B.] Because of observations of Lopez's nervous behavior and Defendants' belief that Lopez was not 25 years old as he represented, Defendant Saenz conducted a pat-down of Lopez's outer clothing.  [Doc. 30, Ex. B, I.]  During the pat-down, Saenz felt a wallet in Lopez's pants and asked Lopez if he could remove the wallet.  Saenz reported that Lopez consented to the removal and inspection of his wallet.  The wallet contained an identification card with his photo, but the name David Lopez.  Lopez then admitted to Defendants that he had given police a false name, Carlos Mendoza, because he had an outstanding warrant for his arrest.

4

Stockton contacted NCIC and confirmed there was a felony warrant for David Lopez. Stockton then placed handcuffs on Lopez, who was arrested on one outstanding warrant for unlawfully discharging a firearm and contributing to the delinquency of a minor, and for new charges of concealing his identity. [Doc. 30, Ex. I.]

Ms. Avila informed officers that Lopez was her boyfriend and that she feared he was going to jail for a long time. She also stated she knew Lopez lied about his identity because of the felony warrant. Early in the encounter, Defendants observed that Ms. Avila appeared to be "stoned out of [her] mind." [Doc. 30, Ex. F, at 42, lines 4-5; Ex. O, at 5, lines 17-22; Ex. I, at ¶ 8; Ex. J, at ¶ 8.] Ultimately, Ms. Avila was arrested for aiding a felon; police also discovered heroin and prescription medications in her purse. [Doc. 30, Ex. B.]

Defendants attached to the <u>Martinez</u> report a lengthy transcript of a belt tape recording belonging to Defendant Saenz. [Doc. 30, Ex. F.] There are a number of inaudible portions, the date is noted as unknown, and the speakers, including officers are unidentified. However, most of the transcript, pages 1-37, relates to the first of two incidents involving the dispute between Ms. Baca and her brother over the child.

Starting on page 38, the transcript shifts to a discussion of the second call to officers which prompted officers to again visit Aragon's and Ms. Baca's apartment. [Doc. 30, Ex. F, at 38, line 20.][3] In the transcript, a male stated that "Johnny [Baca]" and his girlfriend were threatening the

---

[3]In their <u>Martinez</u> report, Defendants identified this transcript of the belt tape recording [Doc. 30, at 4; Ex. F] as being that of Saenz, relating to the September 30, 2010 incident. Exhibit O is Stockton's transcribed belt recording regarding the same incident. [Doc. 30, at 4; Ex. O.] A comparison of the two transcripts [Ex. F, pp. 38-56; Ex. O] indicates they are very similar. Although similar, the Court cites primarily to the page and line numbers in Ex. F.

unidentified male, who appears to be Aragon. [Id., at 39, lines 1-11.] Aragon told the officers that a neighbor called Candice Baca at work, informing her of trouble again at the apartment.

On page 40 of the transcript, the unidentified officer asked the individuals in the apartment: "Can I see all three of your IDs real quick?" An unidentified male stated he had no identification and was told to stay seated. [Id., at 41, lines 1-4.] An unidentified female stated: "We lost them all (inaudible)." [Doc. 30, Ex. O, p. 4, lines 19-20.] Aragon then identified himself. On page 42, Lopez identified himself as Carlos Mendoza, age 25. [Doc. 30, Ex. F, at 42, lines 7-15.][4]

On page 47, the transcript reflects that an unidentified officer observed a wallet in Mendoza/Lopez's pocket. [Id., at 47, lines 6-14.] On page 49, the individuals discussed that identification was located for Mendoza/Lopez. The officer asked if Lopez had a warrant out for his arrest. The male responded: "Uh, discharging a firearm." [Id., at 49, lines 10-18.]

Both Defendants provided affidavit testimony that they were concerned Lopez might have a weapon or access to a weapon based on his location in the apartment near the kitchen, so Saenz asked Lopez to take a seat in the living room. [Doc. 30, Exs. I, J.] Both Defendants believed that Ms. Avila appeared high on illegal drugs on the date in question. [Id.] Both Defendants testified they turned their attention to Lopez because of his nervous behavior and his whispering in hushed to tones to Ms. Avila. [Id.] Neither Defendant believed Lopez appeared 25 years of age. [Id.] Saenz testified that Lopez consented to the search of his pockets as confirmed by the belt tape recording at page 9:3-5 of Ex. O. [Doc. 30, Ex. J, ¶ 18.] Both Defendants stated that Lopez did not ask to

---

[4]A difference between the two belt tape transcripts is that Stockton's transcript indicates when Mendoza/Lopez was asked if he had a weapon on him, Mendoza/Lopez said "No." [Doc. 30, Ex. O, at 8, lines 11-13.] In Saenz's transcript, the unidentified male answered "Yes." [Doc. 30, Ex. F, at 44, lines 15-16.] Based on a reading of the entire transcripts and charges, it does not appear that Mendoza/Lopez was carrying a weapon on this occasion, unless it was a pocketknife. [Doc. 30, Ex. O, p. 12, line 23.]

leave the home during their encounter with him on September 30, 2010. [Doc. 30, Exs. J, O.] Neither officer drew their firearms or weapons during the interaction with Lopez. [Id.]

A subsequent Offender Booking Sheet for Lopez indicates he was charged with concealing his identity in relation to the September 2010 encounter and charged with contributing to the delinquency of a minor, tampering with evidence, conspiracy to contribute to the delinquency of a minor, conspiracy to contribute to tampering with evidence, possession of a firearm, and negligent use of a deadly weapon. The latter charges related to an earlier grand jury indictment. The charges regarding Lopez's concealment of his identity in September 2010, were dismissed in March 2011. [Doc. 30, Ex. H, at 2.]

On March 31, 2011, Lopez entered a "no contest plea" to the charges of contributing to the delinquency of a minor and being a felon in possession of a firearm. [Doc. 30, Ex. K.] Lopez was sentenced to a two-year term of incarceration. [Id.]

In subsequent pleadings, Lopez contends that Defendants had no probable cause to detain him, that they violated his Fourth Amendment rights, and that he did not consent to a search of his person by Defendants. [Doc. 17.] Lopez claims Defendants asked Lopez for his ID, but that Lopez responded he had no identification. [Doc. 19.] Lopez states:

> Now if Plaintiff gave defendants the name Carlos Mendoza who had no wants [sic] or war[r]ants then why did defendants continue to detain the Plaintiff and also cuff and search the plaintiff[?] It was then that defendants were acting outside the scope of their authority.

7

[Doc. 19, at 2.] Lopez further argues that he knew he had "original identification" on September 30, 2010, when he told officers he had no ID.  Thus, according to Lopez, it made no sense that he would have consented to the search by Defendants.[5] [Doc. 19, at 2.]

In the May 2, 2012 response to <u>Martinez</u> report, Lopez asserted that 15 minutes after Defendants' arrival to the apartment on September 30, 2010, Lopez "expressed his desire to leave explaining he was only visiting." [Doc. 31, at 2.] The transcripts of the belt tape recordings do not bear out Lopez's version that he informed Defendants of his desire to leave the apartment.  There are no audible portions indicating Lopez attempted to leave the apartment.  Lopez further claims that "nowhere in the [police] report does it indicate that the police officers believed Plaintiff to be giving a false name and age as defendants claim." [Doc. 31, at 3.]

Neither the Uniform Incident Report nor the Criminal Complaint, filled out by Defendant Stockton, expressly states that Defendants believed Lopez to be lying about his name or age when he said he was Carlos Mendoza, DOB 1/3/85.  However, the reports indicate Lopez was acting nervously and that Defendant Saenz conducted a pat down on Lopez due to his behavior, at which point Defendant found Lopez's wallet containing his true identity. [Doc. 30, Exs B, C.]  Both officers testified via affidavit that they did not believe Lopez appeared to be 25 years old. [Doc. 30, Exs. I, J.]

In support of his position that he gave no consent to the search of his clothing, Lopez identified Stockton's transcript of the belt tape recording at page 17.  At page 17, line 3-4, the unidentified officer asked an unidentified female, presumably Ms. Avila, "if you have anything in

---

[5]One could also question whether it made sense for Lopez to fabricate a birth date of 1985 and tell the officers he was 25 years old, when he was over 20 years older.

there [in her purse] I need to be aware of?"  The unidentified female responded: "(Inaudible)."  The

next communications are:

Unidentified Male:    Is it okay if I look through it?  No?

Unidentified Female: (Inaudible).

. . .

Unidentified Male:    Alejandra  [Avila],  how  come  you
                      won't let us go through your purse if
                      you have nothing to hide?

Unidentified Female: Because  I  don't  have  no warrants
                     (inaudible) look in my purse.  I have
                     some (inaudible) stuff in here.

[Doc. 30, Ex. O, at 17, lines 6-17.] While Lopez contends that these lines indicate he, the plaintiff,

was denying the "illegal search of his person," the discussion on this page was between Defendant

and Ms. Avila about her purse, not the officer and Lopez.

        Lopez also relies on page 19 of Stockton's belt tape recording where the unidentified male

stated near the end of the incident "So you guys weren't cool with me, you guys don't allow me to

search, when there's nothing to hide–" [Doc. 30, Ex. O, at 19, lines 7-9.] However, again this

discussion pertained to the officers' attempt to request consent from Ms. Avila to search her purse

to which Lopez objected.  The same is true regarding page 16 of the belt tape recording, on which

Lopez also relies.  At that point, an unidentified officer asked if there was anything in Ms. Avila's

purse that he needed to be aware of. [Doc. 30, Ex. O, at 16, lines 2-3.] The same officer asked if it

was ok if he checked, but the office then asked: "Why [] you shaking your head, Mr. Lopez?" [Id.,

lines 6-7.] Lopez responded that Ms. Avila had a right to say no, even though she did not know that.

[Id., lines 8-9.]  Clearly, these communications related only to the search of Ms. Avila's purse.

Thus, they provide no support for Lopez's argument that he did not consent to the search of his

person.  Moreover, the evidence of record is to the contrary because Lopez consented to the search of his person and wallet.  [Doc. 30, Ex. F, at 45, lines 11-12; at 48, lines 10-11; Ex. O, at 9, lines 3-5; at 12, lines 3-4; Exs. I, J.]

Other than unpersuasive argument like those summarized above, Lopez's response(s) to the Martinez report did not supply admissible evidence to rebut any of the factual statements set out in Defendants' Martinez report and request for summary judgment.  Lopez cited only the few pages of the belt tape recording transcript and attached a criminal complaint that is part of the Martinez report. [Docs. 19, 31.]

### Discussion

Defendants set forth a number of arguments in support of their position that Lopez's § 1983 lawsuit should be dismissed.  They first assert that Heck v. Humphrey, 512 U.S. 477 (1994) precludes Lopez's cause of action for a Fourth Amendment violation. [Doc. 30, at 10-12.] Secondly, Defendants contend that Lopez should be judicially estopped from claiming Defendants lacked probable cause to arrest him on the day in question because Lopez subsequently pleaded guilty to charges from the outstanding warrant. [Doc. 30, at 12-14.]

Third, Defendants claim that their encounter with Lopez was consensual and that he consented both to the pat-down search and search of his wallet. [Doc. 30, at 15-17.] Last, Defendants argue that they are entitled to qualified immunity, even assuming the encounter at issue was not consensual. [Doc. 30, at 17-24.]

In Defendants' reply, they state that Lopez failed to rebut any of the material facts relating to the encounter, search, and arrest.  For example, Lopez did not provide any evidence to dispute facts relating to where Lopez was standing in the apartment on the date in question, that Johnny Baca was no longer present at the apartment door at that time, that Lopez appeared nervous, that he

10

was asked for identification and lied about his name and age, that Lopez appeared older than the stated age of 25, that he consented to the pat-down search and search of his wallet, that his wallet was located on his person and revealed his true identity, and that he did not ask to leave the apartment. [Doc. 33.] In addition, Defendants correctly observe that Lopez's attempt to challenge the consensual nature of the encounter by citing to the belt tape transcripts was unsupported. [Doc. 33, at 4-5.]

The Court does not consider the judicial estoppel or qualified immunity arguments. Instead, the Court addresses the applicability of <u>Heck</u> and the merits of the Fourth Amendment claim.

## I.    **Heck v. Humphrey Bar**

Before examining the merits of Defendants' request for summary judgment, the Court addresses the possible application of <u>Heck v. Humphrey</u> to the facts of this case. "Under <u>Heck</u> . . . , a plaintiff may not sue under 42 U.S.C. § 1983 if success in the action would undermine a criminal conviction." <u>Garza v. Burnett</u>, 672 F.3d 1217, 1218 (10th Cir. 2012). Stated differently, a § 1983 claim is barred if it "would necessarily imply the invalidity of any conviction" unless the plaintiff proved that the conviction or sentence was reversed, expunged, or otherwise invalidated. <u>Heck</u>, 512 U.S. at 486-87.

Thus, when a state prisoner, like Lopez, seeks monetary damages in a § 1983 lawsuit, the district court must examine whether a judgment in favor of Lopez would necessarily imply the invalidity of his conviction, *i.e.,* in other words, Lopez's conviction for the outstanding warrant related to charges of unlawfully discharging a firearm and contributing to the delinquency of a minor. If a judgment in favor of Plaintiff on his Fourth Amendment claims alleging that Defendants unlawfully searched and seized him would invalidate his conviction, then the § 1983 complaint would be dismissed. But, if the district court determines that Lopez's § 1983 claims, even if

successful, would not demonstrate the invalidity of any outstanding criminal judgment against him, the action would proceed.  *See* id.

Although Defendants argue to the contrary, the Court finds the Tenth Circuit Court of Appeals decision in Butler v. Compton determinative as to the applicability of the Heck bar.  In Butler, a state inmate brought a § 1983 claim against a police officer, alleging that his arrest violated his Fourth Amendment rights.  Butler, 482 F.3d 1277 (10th Cir. 2007).  The district court dismissed the complaint, but the Tenth Circuit reversed, determining that the Heck did not bar the lawsuit because there was not a ***related*** underlying conviction that would have been invalidated by the § 1983 lawsuit.  Id. at 1280-81 (emphasis added).

In Butler, the defendant argued to the trial court that Heck barred the plaintiff's § 1983 claim because he pled guilty to three counts of burglary, all of which arose "from the same incident as [the plaintiff's] § 1983 action."  Id. at 1278.  In contrast, the plaintiff asserted that the burglary charges to which he pled guilty were unrelated to the incident with the defendant police officer, and that the charges related to the incident in question were dismissed.  The trial court agreed with defendant and applied the Heck bar, dismissing the § 1983 lawsuit.

In reversing, the Tenth Circuit instructed that "[t]he starting point for the application of Heck [] is the existence of an underlying conviction or sentence that is tied to the conduct alleged in the § 1983 action.  In other words, a § 1983 action implicates Heck only as it relates to the conviction that it would be directly invalidating."  Id. at 1279.

In Butler, the Tenth Circuit held that there was no such conviction that would be directly invalidated.  Id. at 1979-80.  This was true because Butler was not convicted of the burglary charges arising out of the defendant officer's arrest; instead, he was convicted of three other unrelated burglary charges after he pled guilty to those charges.  Id.  The Tenth Circuit concluded that even

12

though Butler pled guilty to the unrelated burglary charges as part of the same plea agreement in which the burglary charges arising out of the police officer's arrest were dismissed, Butler did not challenge any conduct "relating to his conviction on the three burglary charges to which he pled guilty." Id. at 1280.  Butler's sole challenge to the constitutionality of the officer's conduct related to his arrest for the burglary charges that were dismissed.  Id.

Here, the underlying facts are similar to those in Butler.  Lopez was found to have concealed his identity on September 30, 2010, and was charged with that crime.  He contends that the search and seizure that led to the discovery of his true identity were unlawful.  However, subsequent to his arrest, the new charges of concealing his identity were dismissed.  Lopez was also arrested because of an outstanding warrant for charges of  unlawfully discharging a firearm and contributing to the delinquency of a minor.  He pled guilty to those charges, for which a grand jury had already indicted him on an earlier date.  Thus, the evidence that supported those charges is unrelated to evidence that supported the charge of concealing his identify on September 30, 2010.

In other words, Lopez's underlying conviction or sentence was not tied to the conduct alleged in the § 1983 action, even though Lopez had the bad luck to be in the wrong place at the wrong time, with an outstanding felony warrant for his arrest.  The validity of Lopez's conviction for charges in the outstanding warrant does not directly depend on the legality of the officers' search and seizure of Lopez on September 30, 2010.  Lopez could have been located the next day and arrested for the outstanding warrant, with the result that he was convicted.

Stated differently, if the Court were to find that Defendants' actions in searching and seizing Lopez were unlawful on September 30, 2010, such findings would not necessarily call into question the validity of Lopez's eventual conviction for the earlier indicted crimes.  A plaintiff can have a successful wrongful arrest claim and still have a perfectly valid conviction.  In addition, this is true

13

because the evidence underlying the conviction for unlawfully discharging a firearm and contributing to the delinquency of a minor was independent and obtained through means other than Lopez's arrest on September 30th.  The evidence supporting Lopez's convictions was not "uniquely available from the alleged illegal search."  Such evidence had already been gathered and presented to a grand jury.  *Compare* Ballenger v. Owens, 352 F.3d 842, 846-47 (4th Cir. 2003) (Heck bar applied where cocaine seized was uniquely available from alleged illegal search; if cocaine were suppressed, there would be no evidence to convict Ballenger for drug trafficking).  Moreover, Lopez's possible success in this § 1983 suit would not "negate an element of the offense[s]" for which he was convicted.  *See* Heck, 512 U.S. at 486 n. 6.

Thus, for the reasons stated above, the Court finds that Heck does not bar Lopez's § 1983 lawsuit.

## II.   <u>Summary Judgment Standard</u>

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party asserting that it is entitled to summary judgment must support its assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  The Court may grant summary judgment in favor of the movant if the material facts are undisputed and show that the movant is entitled to judgment.  Fed. R. Civ. P. 56(e)(2) and (3).

The moving party bears the burden of showing that no genuine issue of material fact exists. Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 979 (10th Cir. 2002); Muñoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1164 (10th Cir. 2000).  The Court resolves all factual disputes and

draws all reasonable inferences in favor of the non-moving party.  *See, e.g.*, Wade v. Emcasco Ins. Co., 483 F.3d 657, 660 (10th Cir. 2007).  However, the opposing party may not rest upon mere allegations and denials in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of fact is "genuine if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party." Id. at 249-50.  Mere assertions, conjecture, or the existence of a scintilla of evidence in support of the non-movant's position, are not sufficient to show a genuine issue of material fact; an issue of material fact is genuine only if the non-movant presents facts such that a reasonable jury could find in favor of the non-movant. Carpenter v. Boeing Co., 456 F.3d 1183, 1192 (10th Cir. 2006) (citations and quotations omitted).

"The purpose of a summary judgment motion is to assess whether a trial is necessary." Berry v. T–Mobile USA, Inc., 490 F.3d 1211, 1216 (10th Cir. 2007).  "In other words, there 'must be evidence on which the jury could reasonably find for the plaintiff.' " Id.

## Analysis

### A.     *Fourth Amendment*

In accordance with the Fourth Amendment, people have the right "to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."  U.S. Const. amend. IV.  However, the Fourth Amendment prohibits only "unreasonable" searches and seizures. United States v. Najar, 451 F.3d 710, 713-14 (10th Cir.), *cert. denied,* 549 U.S. 1013 (2006). Warrantless searches and seizures inside a home are presumptively unreasonable, Payton v. New York, 445 U.S. 573, 586 (1980), but the presumption is not absolute.  For example, there is no violation of the Fourth Amendment, "when, under the circumstances, it is objectively reasonable for the official to believe that the scope of a person's consent permitted him to conduct the search."

15

Dubbs v. Head Start, Inc., 336 F.3d 1194, 1207-08 (10th Cir. 2003) (*citing* Florida v. Jimeno, 500

U.S. 248, 251 (1991); Illinois v. Rodriguez, 497 U.S. 177, 186 (1990); United States v. Osage, 235

F.3d 518, 519–21 (10th Cir. 2000)), *cert. denied,* 540 U.S. 1179 (2004).

**B.      *Alleged Unlawful Seizure***

The Court first addresses whether Lopez was seized by Defendants when they entered the

apartment and asked for identification of all three individuals, including Lopez.  It is undisputed that

Defendants were dispatched to Aragon's address and that Aragon, one of two tenants of the

apartment, gave permission for Defendant officers to enter.  Thus, there is no evidence of an

unlawful entry, and therefore, no Fourth Amendment violation in reference to the police entry into

the home.

Lopez argues, however, that he attempted to leave the apartment once Defendant officers

arrived in response to the domestic dispute that did not concern him.  He claims that he told

Defendants of his intention or desire to leave the apartment.  However, nothing in the transcripts of

the two belt tape recordings supports Lopez's claim that he sought to leave and was prevented from

doing so, and nothing in the belt tape recordings indicates that Lopez was moving toward the

doorway and directed to stop by Defendants.  While portions of the transcripts are inaudible, there

is no hint of any discussion between Lopez and Defendants where Lopez stated he wished to leave

or was leaving the apartment.  Moreover, while Lopez contends he sought to leave the apartment,

he did not cite any portion of the transcripts of the belt tapes to support his contention.  In contrast,

Defendants supplied affidavit statements to the effect that Lopez never asked to leave the apartment.

[Doc. 30, Ex. I, ¶ 25; Ex. J, ¶ 25.]

Lopez may argue that he was unlawfully seized when Defendants asked him for his

identification.  Defendant Stockton asked the individuals in the apartment whether he could "see all

16

three of your IDS real quick." [Doc. 30, Ex. O, at 4, line 8.] They all responded they had no identification.  When asked his name, Lopez voluntarily responded, but then misidentified himself as Carlos Mendoza, DOB 1/3/85, age 25. [Id., at 5-6.]

The Court does not find that Defendants acted unlawfully in asking Lopez for his identification or name.  The Tenth Circuit stated that "police officers may approach citizens, ask them questions and ask to see identification without implicating the Fourth Amendment's prohibition against unreasonable searches and seizures."  United States v. Esparsa-Mendoza, 386 F.3d 953, 958 (10th Cir. 2004).  *See* Florida v. Bostick, 501 U.S. 429, 434–35 (1991) and United States v. Johnson, 364 F.3d 1185, 1188–89 (10th Cir. 2004) (it is well settled that police may ask to see identification without effecting a seizure). *See also* INS v. Delgado, 466 U.S. 210, 216 (1984) ("interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute, a Fourth Amendment seizure."); United States v. Olivares-Campos, 2008 WL 1930073, No. 06-3411, at *3 (10th Cir. May 2, 2008) (unpublished) (same).

Lopez also may argue that Defendants unlawfully seized him when they directed an unidentified male to take a seat in the apartment, shortly after learning the three individuals had no identification.  In the transcripts of the belt tape recordings, an unidentified officer stated "Stay sitting down.  Stay sitting.  Stay there."  It is not clear to whom the officer was speaking.  In the next line, an unidentified male asks if he can sit down, and it appears that one of the officers stated, "Yeah." [Doc. 30, Ex. O, at 4, lines 14-18.] Later after locating Lopez's wallet and his true identify, an unidentified officer told presumably Lopez "Have a seat there man." [Doc. 30, Ex. O, at 11, lines 18-19.]

In determining whether an individual has been seized, the Court considers several factors, including:

> (1) the threatening presence of several officers; (2) the brandishing
> of a weapon by an officer; (3) physical touching by an officer; (4)
> aggressive language or tone of voice by an officer indicating
> compliance is compulsory; (5) prolonged retention of a person's
> personal effects; (6) a request to accompany the officer to the police
> station; (7) interaction in a small, enclosed, or non-public place; and
> (8) absence of other members of the public.

United States v. Rogers, 556 F.3d 1130, 1137–38 (10th Cir.), *cert. denied,* 129 S.Ct. 2783 (2009).

No single factor is dispositive, and this list is not exhaustive.

Based on the transcripts of the belt tape recordings and Defendants' affidavits, along with Lopez's unspecified accusations, the Court concludes there was no seizure when Defendants first instructed Lopez to stay seated.[6] Nothing in the transcripts indicates the officers were threatening or brandishing any weapons. Defendants' affidavits confirm that no weapons were drawn during the encounter. There was no physical touching when Lopez was first directed to be seated. Indeed, it appears that either Lopez or Aragon asked to be seated. [Doc. 30, Ex. O, at 4, lines 17-18.] To the extent that tone of voice is conveyed by a written transcript, there is no evidence that Defendants used an aggressive tone in instructing Lopez or Aragon to "stay sitting down." Defendants did not use aggressive language and did not retain any belongings of the three individuals until after Lopez consented to the removal and inspection of the wallet, which in turn resulted in the discovery of evidence that Lopez lied about his identity. There was no request by Defendants that Lopez accompany them to the police station at this point. Moreover, there were two other individuals present with Lopez during the encounter. While the interaction occurred in an apartment, Lopez stated he was voluntarily at the apartment with his girlfriend, visiting his friend Aragon.

---

[6]At the point when Defendants told Lopez to have a seat, after discovering he had lied about his identity, Defendants had probable cause to arrest Lopez for concealing his identity.

Based on a review of the totality of the circumstances and the pertinent law, the Court concludes that Lopez failed to raise a genuine issue of material fact regarding his claim that Defendants unlawfully seized him.

### C.      *Alleged Unlawful Pat-Down Search*

Lopez argues that he was illegally searched and more specifically, that the "initial frisk was simply not supported by a reasonable belief that he was armed and presently was dangerous . . . ." Thus, according to Lopez, Defendants did not have reasonable suspicion to conduct the pat-down search.  [Doc. 31, at 1.]

Under the Fourth Amendment, a pat-down search generally requires reasonable suspicion that a suspect is armed and dangerous.  United States v. Lazos, 314 F. App'x 127, 131 (10th Cir. Feb. 24, 2009) (unpublished).  In Lazos, the Tenth Circuit explained:

> The reasonable suspicion required to justify a pat-down search represents a minimum level of objective justification. . . . Reasonable suspicion is based on the totality of circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense." [United States v.] Rice, 483 F.3d [1079,] at 1083 [10th Cir. 2007] (quotation marks and citations omitted). "[A] court may not engage in a sort of divide and conquer analysis by evaluating and rejecting each factor in isolation." United States v. Cheromiah, 455 F.3d 1216, 1221 (10th Cir. 2006) (quotation marks omitted).

Id. at 131-32.

The Tenth Circuit also instructed that the reasonable suspicion required to conduct a pat-down search of an individual "need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Rice, 483 F.3d at 1083 (*quoting* United States v. Arvizu, 534 U.S. 266, 274 (2002)).  "The purpose of the limited pat-down search is not to discover evidence of crime, but to allow the officer to pursue his investigation

19

without fear of violence." United States v. Sanchez, 519 F.3d 1208, 1216 (10th Cir.), *cert. denied* (2008) (internal citation omitted). *See also* Rice, 483 F.3d at 1083 ("Officer safety is the primary objective justifying an officer's right to perform a pat-down search.").

Under a totality of the circumstances, the Court concludes that Defendants had sufficient reasonable suspicion to conduct the pat-down of Lopez's outer clothing. Based on Defendants' experience and training, they justifiably were concerned with Lopez's location near the kitchen and possible accessibility to weapons. Both Defendants provided affidavit testimony that they were concerned about potential weapons Lopez might have since he was standing near the kitchen when Defendants entered. Notwithstanding this concern, Defendants did not immediately conduct a pat-down of Lopez; instead, they asked him to be seated in the living room. [Doc. 30, Ex. J, ¶ 5.]

Lopez sat down next to Ms. Avila, who Defendants suspected was a minor (she was actually 21 years old) and who appeared high on illegal drugs. Defendants testified that Ms. Avila's eyes were red and bloodshot and that she seemed unable to pay attention to the situation around her, as indicated in the belt tape transcript. [Doc. 30, Ex. J, ¶ 7, 8.]

Defendants then learned that Lopez was at the apartment to give Aragon a tattoo. During the interaction, Defendants observed that Lopez was acting in a nervous manner, was fidgety with his arms and hands, could not sit still, his hands were shaking, and he repeatedly whispered in hushed tones to Ms. Avila. Defendants believed that Lopez exhibited "more nervousness than the typical citizen who comes into contact with the police." [Doc. 30, Ex. J, ¶ 9.] Thus, Defendants turned their attention to Lopez because of his nervous behaviors and interactions with Ms. Avila. *See* Johnson, 364 F.3d at 1192 and United States v. Harris, 313 F.3d 1228, 1236 (10th Cir.) (noting that while "typical nervousness alone" is not sufficient to establish reasonable suspicion, the officers

20

may take into account nervous behavior in determining whether a protective frisk is justified), *cert. denied,* 537 U.S. 1244 (2002).

Next, it was apparent to Defendants that Lopez was not being truthful in saying he was 25 years old when Defendants easily determined from his face that he was significantly older than 25. "He had wrinkles around his mouth and eyes that are indicative of someone older than their mid-twenties." [Doc. 30, Ex. J, ¶ 13.] Indeed, Lopez was 48 years old, almost twice his stated age.

At this point, Defendants believed they had probable cause to arrest Lopez for concealing his identity. [Doc. 30, Ex. J, ¶ 15.] The Court determines that based on a totality of the circumstances, at a minimum, Defendants reasonably believed Lopez posed a danger or that there was evidence of criminal activity, whether it be Lopez's concealment of his true identify or illegal drug use by Lopez's companion to whom Lopez was whispering. Thus, Defendants had reasonable suspicion to conduct the pat-down of Lopez's outer clothing for purposes of continuing their investigation without fear of violence, *i.e.,* for the officers' safety and the safety of others. In so finding, the Court gives "deference to the officer[s'] ability to draw on [their] own experience and specialized training to make inferences from and deductions about the cumulative information available to [them] that might well elude an untrained person." *See* <u>Johnson</u>, 364 F.3d at 1193 (quotation marks and citations omitted).

### D.   <u>*Consent to Search*</u>

Even if the Court were to find the existence of genuine issues of material fact concerning whether Defendants had reasonable suspicion to conduct the pat-down search, Lopez consented to the search. As noted in the transcripts of the belt tape recordings, an unidentified officer first asked "Carlos" [Lopez] if he had any weapons on him. Mendoza/Lopez responded that he did not. [Doc. 30, Ex. O, at 8, lines 11-13.] The officer then stated:

21

Stand up for me, okay?  Turn around and face your buddy and put your ands on top of your head. . . . There's nothing in your pockets that's going to poke me, stick me or anything like that?

Male:  Yeah, I got (inaudible).

. . .

Police: What do you got back here, Bob?  Is it okay if I check?

Male:  Yeah.

. . .

Police: Doing all right?

Male:  Yes.

Police: What do you got here?

Male:  Cigarettes.

Police: Is it cool if I check?

Male:  (Inaudible).  That's a tissue (inaudible).

[Doc. 30, Ex. O, at 8-9, lines 11-25; 1-19.] At no time during this search did Lopez refuse consent to Defendants to search his outer clothing.  In fact, Lopez stated "yeah" when Defendant asked if he could check a pocket.

A short time later, Defendant located something in Lopez's pocket and asked what it was. [Doc. 30, Ex. O, at 11, lines 1-2.] The officer asked: "What's in your pocket right there?"  Lopez's response was inaudible.  The officer then asked: "Is it okay if I check?"  Lopez answered: "Yeah." [Doc. 30, Ex. F, at 48, lines 8-11.][7] At this point, Defendants saw that Lopez's ID stated his name

---

[7]The two transcripts differ where the officer asked for consent to check the wallet.  In Stockton's transcript [Ex. O, at 12], the officer asked if it was ok to check the wallet and the transcription indicates an unidentified female answered: "yes."  However, Saenz's transcript [Ex. F, at 48] states a male indicated "Yeah" in response to the question.  Based on the line of questioning, it appears that the officer

22

was David Lopez, and Lopez admitted that he had lied to Defendants about his name "[b]ecause I got a warrant." [Doc. 30, Ex. O, at 13, lines 6-17.]

The Tenth Circuit recognizes that valid consent is an exception to the general prohibition against warrantless searches. Eidson v. Owens, 515 F.3d 1139, 1145-46 (10th Cir. 2008). In United States v. Polly, the defendant argued that his response of "I don't mind" or "I don't care" to the officer's request to search him, could not be considered consent. Polly, 630 F.3d 991, 998 (10th Cir. 2011). Polly asserted that his equivocal responses were not consent and merely indicated he believed he would be searched no matter how he responded. Id. The Tenth Circuit rejected Polly's argument, finding that even the words "I don't care" indicated consent under the circumstances. Polly also contended that his consent was invalid because it was coerced. The Court rejected this argument as well. Id. at 998-99.

Here, it is unclear whether Lopez argues his consent was coerced. But to the extent he does, the Court determines that upon a review of the totality of the circumstances, Lopez freely and voluntarily consented to Defendants' search of his outer clothing and his wallet. Lopez was not in a custodial setting. Defendants did not have their weapons drawn, they used a conversational tone in their dealings with Lopez, they made no threats and did not engage in deception or trickery, only two officers were present, and Lopez was not alone. See Polly, 630 F.3d at 999. See also United States v. Pena, 143 F.3d 1363, 1366 (10th Cir.), cert. denied, 525 U.S. 903 (1998).

Based on an examination of the totality of the circumstances, the Court concludes that Lopez failed to raise any genuine issues of material fact with respect to Defendants' reasonable suspicion

---

was talking to Lopez at this point. However, it also appears that the officers may have been talking at the same time to different individuals.

to conduct the pat-down search of his outer clothing, or, alternatively, Lopez failed to raise genuine issues of material fact that his consent to the search was valid.

     ***E.    <ins>Arrest</ins>***

Probable cause to make a warrantless arrest exists if facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense. <ins>Romero v. Fay</ins>, 45 F.3d 1472, 1476 (10th Cir. 1995). There is no question that Defendants had probable cause to arrest Lopez both for the new charge of concealment of identity and the outstanding warrant once they learned from Lopez that he had lied about his identity because of an outstanding felony arrest. Moreover, officers confirmed the existence of the outstanding warrant for Lopez's arrest, and Lopez was ultimately convicted of the offenses for which he was arrested. For these reasons, there are no genuine issues of material fact concerning the lawfulness of the arrest.

## Conclusion

Lopez failed to raise genuine issues of material fact in dispute regarding his contentions that Defendants unlawfully seized, searched, or arrested him. Thus, his Fourth Amendment claims are subject to dismissal.

## Recommended Disposition

That Defendants' motion for summary judgment be granted [Doc. 30], with the result that Plaintiff David Lopez's § 1983 complaint [Doc. 1] be denied and the case be dismissed with prejudice.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
United States Magistrate Judge